## Case No. 448.
### ANONYMOUS.
[Hempst. 450.][1]

Circuit Court, D. Arkansas. April, 1845.

#### COSTS—MARSHAL'S FEES—MILEAGE.

1. The marshal is not entitled to commissions on a forfeited delivery bond.

[1][Reported by Samuel H. Hempstead, Esq.]

2. The marshal is entitled to mileage actually travelled, in enabling him to make a return of nulla bona..

District Court, D. Maryland. 1808.

#### SEAMEN—ARTICLES OF SHIPMENT—CHANGE OF VOYAGE.

[1. The term "voyage" is a technical phrase, and always imports a definite commencement and end, and therefore the addition of the term "elsewhere" in shipping articles specifying a voyage from Baltimore to Curacoa does not authorize a voyage to St. Domingo, since such term must be construed as subordinate to the voyage specified, and only permits such a change of course as may be necessary to accomplish the voyage designated in the articles of shipment.]

[Cited in The Brutus, Case No. 2,060.]

[2. Cited in Magee v. The Moss, Case No. 8,944, and Brown v. Jones, Id. 2,017, to the point that the term "voyage" is a technical phrase, and always imports a definite commencement and end, and that the term "elsewhere" must be construed either as void for uncertainty, or as subordinate to the principal voyage stated in the preceding words.]

WINCHESTER, District Judge. In this case the libellant claims wages for services rendered in a voyage from Baltimore to St. Domingo, and back, and alleges that the voyage which he stipulated to perform was from Baltimore to Curacoa and back, and not to St. Domingo where the vessel did go contrary not only to the articles, but the express understanding of the parties, and the declaration of the libellant, that he would not ship on a voyage for St. Domingo. The articles exhibited specify a voyage to Curacoa and elsewhere; and under the latitude of the last general words the respondent contends that he was authorized to go to St. Domingo, without proceeding to Curacoa. Taking the fact alleged to be true, that the voyage in view and actually prosecuted, was from its commencement for St. Domingo and not the port of Curacoa; the objection to pay the libellant's wages comes with a very ill grace from the respondent, who shows and rests on his own deception and breach of faith as the foundation of his defense: and the court would reluctantly discover any rule of law so imperative as to compel the sustenance of such a justification.

The act for the government and regulation of mariners contemplates two species of contract between owners and seamen. 1. For a voyage or voyages. 2. For a term or terms of time. The latter is undoubtedly

the proper form of articles where the destination of a vessel cannot be specifically known, and where the vessel is employed on what is called a trading voyage, or is in search of freight. The first, to wit, that in which the voyage or voyages are specified, applies to designated ports, or particular kinds of voyages known and understood to be governed in their extent and duration. The term "voyage," like the term "voyage assured," is a technical phrase, and always imports a definite commencement and end. Nomen loci ubi navis oneratur et nomen loci quo navis tendit. The voyage from Baltimore to Curacoa is therefore a specified voyage, the labor and hazard of which is known to all parties; and for that voyage the agreement is such as the statute requires. But the terms "and elsewhere" are added to this specification of voyage, and it is insisted by the respondent's counsel, that under these words he was authorized not only to invert the order of voyage specified in the articles, but to go to any other port, as to St. Domingo. If this construction was sound, the provisions of the act of congress, which require a specification of the voyage, when the hiring of seamen is not for a given time, become a dead letter ; because there would be no terminus ad quem, which is essentially necessary to the legal sense of the term "voyage." The terms "and elsewhere" must therefore be construed as subordinate to the voyage specified, and can only authorize the pursuing such a course as may be necessary to accomplish the principal voyage, or in other words, to import no more than the law would imply as incidental to the main contract. All arguments which rested on the defendant's right to construe these articles as giving him the alternative of several ports, must fail of course. Indeed there is nothing in the words of the contract which, independently of the ground before taken, would warrant, by rules of law or grammatical construction, such an interpretation. The term and is properly conjunctive; and is never construed to be disjunctive unless when coupled with a manifest intent apparent upon the writing itself, that it was used in such sense and for such purposes by the parties. The only intent manifested upon the face of the articles before the court, is such as is fairly to be understood by the words from Baltimore to Curacoa and elsewhere; and it would be doing very great violence to these words to invert the order of ports; for if the respondent is once exempt from the necessity of proceeding to Curacoa, the specified voyage, there is nothing which would restrain his entering upon the most remote and perilous voyage the adventurous and enterprising spirit of commerce could suggest. I do not wish to be understood as giving any opinion, that it is essential to the validity of seamen's articles,

that there should be an insertion of the name of every port to which a vessel may proceed in the course of trade; but that there must be some equivalent specification, such as to a port or ports, island or islands in the West Indies, or to the Mediterranean, or the like. The legal termination of such a voyage is ascertained by the most solemn decisions and able opinions.

But for a moment let us adopt the construction of the respondent's counsel, and admit the words "and elsewhere" to be understood in the alternative, as wished by the respondent, and apply the same rule in favor of the libellants. The clause in the articles runs thus: "We the undersigned have shipped as mariners on board the schooner ———, master, for a voyage from the port of Baltimore to the port of Curacoa and elsewhere, at the monthly wages, &c." Admit that the respondent was not bound to proceed on the voyage to Curacoa by reason of the words and elsewhere, which shall be construed to give him an election to go to St. Domingo. The right then is commensurate with the whole case, and considering the word and in its disjunctive character and importing the same as or, it must be construed throughout as a disjunctive; and the articles must then be read thus, for a voyage from Baltimore or elsewhere, to Curacoa or elsewhere; for the port of Baltimore is not more positively described as the port of departure, than Curacoa is as a port of destination. The term voyage is the antecedent to which the disjunctive relates. It would then be open to the libellants to argue and prove that he did not mean to sail from Baltimore but another port, as New York for instance, and not to Curacoa but Cuba. This would be opening the door to all dangers and inconveniences so wisely guarded against by the act of congress, which requires an insertion of the voyage or voyages contemplated. And I would put it to the consideration of the respondent's counsel, whether, (supposing there was no rule of law binding in this case, and it rested upon the sound discretion of the court, and considering the characters who usually foment and conduct disputes in favor of seamen, and the character of the witnesses frequently produced to establish their claims when resting wholly on parol evidence,) the interest of merchants and ship-owners and public morals as well as private justice will not be more effectually subserved, promoted and secured, by the rule I have taken, than the one for which he has argued.

It was decided by my predecessor, that the words "and elsewhere," annexed to a specified voyage, did authorize the proceeding to one other port, but still that the ports must be proceeded to in the order of their specification. I never was satisfied with the first part of that opinion, as I have often incidentally mentioned, but the point has never been directly brought before me until in

this case. I have long combated with my impressions on this question; but on the fullest consideration, I do hold myself bound to declare, that the words "and elsewhere," used as they are in this case, cannot authorize a new voyage, unless such an intent is fairly deducible from some relative expression, and that their true construction is subordinate to the principal voyage. It is due to the memory of Judge Paca, as well as myself, to state briefly the reasons of my opinion. It has been argued, that these articles are to receive such a construction as will comport with the usual course of the West India trade; which is stated to be, to seek the best market without regard to the particular ports specified. I do not know whether such be the usage, nor is it material to inquire, for as applied to the construction of a written contract, and to control legal rights, it is at direct war with every principle of law and policy. The argument from the admission of evidence to explain the course of a voyage does not justify the inference analogically drawn by the respondent's counsel. The duty of a captain is to proceed in the usual route of the voyage to his place of destination. There is a plain distinction between the voyage itself and the route of the voyage. The voyage is characterized by its termini. No evidence is admissible in any case to substitute other termini: but of two routes, it is lawful to show that either is equally safe and common. Distinguitur iter a viaggio. In the case before the court, the voyage, for which the seamen shipped, never had any commencement. The vessel sailed direct for St. Domingo, and not for Curacoa. In 2 Emerigon, 34, 35, the construction of these general and indefinite clauses is ably investigated, and unless I had found myself supported by very respectable authority, the decision of Judge Paca would have been adhered to by me until reversed by a superior court. This respectable author declares that these vague and indeterminate clauses are to be interpreted by the principal object spoken of, and in case of doubt are to be understood relatively to law and the usages of commerce. Thus an insurance for time, with permission to trade wherever the captain shall think fit, does not protect against a loss occasioned by smuggling. The assurers answer for no loss arising from the fault of the assured, although smuggling in a foreign court is not considered a crime or legal fault. These clauses, however general in their wording, are always expounded according to good faith, and admit neither of fraud nor surprise; generaliter probandum est, ubicumque in bona fide judicis confertur in arbitrium domini vel procuratoris ejus, conditio; pro boni viri arbitrio hoc habendum esse.[1]

In the opinion of the court, the words of the statute "what port, harbor or creek," were considered very express and equivalent to licensing for a voyage. If this determination does not exactly run on all fours with the case to be decided, its principles are so nearly similar as to render an accurate discrimination very difficult, if not impossible. The voyage or voyages for which seamanship are required by the statute to be specified in their articles. The term voyage imports navigation from one port to another, and perhaps, if not otherwise expressed, back again. In the plural it imports, a commencing at more than one port, or in other words, at several specified places. The commencement and termination of a voyage or voyages are ascertained by the ports or harbors from and to which a vessel is destined. The terms, "to trade along the coast," or "to every port, harbor or creek," include all the ports, harbors and creeks of a nation, in which a vessel is licensed for coasting trade. But it is not a compliance with a statute which enjoins that the particular ports shall be inserted. To require the insertion of the voyage, is neither more nor less than the insertion of the ports or harbors from and to which the vessel navigates. Of consequence, the unqualified term "elsewhere," applied to a specified voyage, is not designatory of any port or place, nor is it relative to any voyage in the legal sense of the term; it has no specific relation to any port or place whatever; and to apply it to all ports or places in the world would be as inconsistent with justice, as it would be unauthorized by law. This decision is not different from old determinations. The rules, which apply to a right to a private way at land, cannot materially vary from those which are applicable to a contract for service in a voyage at sea. A prescription for a way is not good if it does not say a quo termino ad quem the way goes. Resolved [Alban v. Brounsall,] Yel. 164, and this not indefinitely but certainly, [Crossing v. Scudamore,] 2 Lev. 10. As from A to a rectory, the terminus ad quem is uncertain, for the rectory consists of glebe, tithe, parsonage, etc. So, that he is seised of B and has a way through the close of the plaintiff to the Thames, for he ought to say that he has a way from B through the close, etc., to the Thames. [Staple v. Heydon,] Mod. Cas. [6 Mod.] 3.

---

[1] NOTE, [from original report in Hall's Law Journal.] A very important decision has taken place in England before the honorable chief justice, Baron Eyre, on the construction of the tenth section of the stat. 24 Geo. III., c. 47, (Gossley v. Barlow, 1 Anstr. 23,) regulating the coasting trade, and licensing vessels, and providing that such license shall specify the tonnage, etc., of the vessel licensed, and for what port, harbor or creek, she is about to sail. A license was granted, "to be employed in the coasting trade," generally. In support of this license it was argued that it meant to include all the ports in England, which is the same thing as if it specified every one; and it was agreed that such was the common form of licenses to coasters.

If this case should still be considered doubtful, let the argument ab inconvenienti be applied, and what will be the result? The construction I have adopted can never produce inconvenience to the ship owner, since in almost every case he does order the route and destination of her voyage previous to her departure; and it is easy and just to make his agreement with the seamen conform to such orders. If there is a discretionary authority confided to the captain to proceed to other ports, such authority will at least be limited by some bounds; and the articles should be drawn to meet such an alternative voyage, and to conform to the real object of the owner; and this object, so far as the rate and wages would be influenced by it, ought to be communicated to the sailors; or if it is not thought expedient to do so, they should be hired for a term or terms of time, as authorized by the act of congress. While the ship-owners are thus fairly secured against inconvenience, no more than justice is secured to the seamen. Adopt a different rule, and they may unjustly be entrapped into voyages of greater length, more hazard, peril and labor, and of course for which they ought to receive greater wages and greater advance; and of which increased compensation they would be deprived under such general words, too often improperly and most frequently thoughtlessly introduced into their articles.

The considerations of policy and the general rules of law, before stated, have great weight with me. Indeed I think it more desirable, that the principles of mercantile law should be referred to general axioms, than to the unbending authority of particular decisions: and it is therefore my custom not to refer so much to cases or opinions, as to universal principles. But on this occasion I shall add the weight of some opinions from a source to which we resort habitually for our judicial direction. It is stated by Park (title "Deviation") "that it is necessary to insert, in every policy of insurance, the place of the ship's departure and also of her destination;" and in a preceding part of his work, (page 23, Ed. 1787,) when referring to the same rule, he remarks, "this has always been held to be necessary in policies, at least for upwards of two hundred years; and must be so, on account of the evident uncertainty which would follow from a contrary practice, as the insurer would never know what the risk was he had undertaken to insure." Molloy, 6, 2, c. 7, § 14, has laid down this doctrine, that if a ship be insured from London to ——, (a blank being left by the lader of the goods to prevent her surprise by an enemy,) if she happen to be cast away, though there be private instructions for her port, yet the insured must sit down with his loss, by reason of the uncertainty." "Such also," says Park, "is now the law and usage of merchants." These opinions and principles are supported by the determination in Lava-

bre v. Walter, 1 Doug. 284, in which the voyage insured was described in these words, "at and from port l'Orient to Pondicherry, Madras and China, and at and from thence back to the ship's port or ports of discharge in France, with liberty to touch, in the outward and homeward bound voyage, at the isles of France and Bourbon, and at all or any other ports or places whatsoever; and it shall be lawful for the said ship in this voyage to proceed and sail to, and touch and stay at any ports or places whatsoever, as well on this side as on the other side the Cape of Good Hope, without being deemed a deviation." The ship went to Pondicherry, whence she went to Bengal, back to Pondicherry and sailed thence for, and was captured on her return to l'Orient. Both going and returning she either touched at, or lay off Madras, Masulipatam, Visigapatam and Yanon, and took in goods at all those places. This was held to be a deviation. This case is also very accurately reported in Emerigon, who remarks on the policy, "that however general the words of the policy were, they could not be construed more largely than the specified voyage, which was for Pondicherry, Madras and China." These cases apply to the construction of the loose and indeterminate clauses of maritime contracts; and when fairly investigated will be found no more than a correct application of old and well established rules drawn from Roccus, Stympanus and Le Guidon le Mer to modern cases. But the case of Woolbridge v. Boydell, 1 Doug. 16, more immediately resembles the case now before the court in its facts and circumstances than any I have referred to. See Park, 260, S. C.

NOTE. [from original report in Hall's Law Journal.] The above decision is faithfully copied from a MS. in the writing of its highly distinguished author. As it was not prepared by him for the press, this explanation is due to his memory on the part of the editor.